Connolly, J.
CMG Holdings, Inc. f/k/a the Customer Management Group, Inc., and the Customer Management Group, LLC (collectively “plaintiffs”), have filed numerous claims against AT&T Corporation, Teleport Communications Group, Inc., and TCG CERFnet, Inc. (collectively “defendants”), arising out of the installation and maintenance of telecommunications services.
Plaintiffs have sued defendants for breach of contract, breach of covenant of good faith and fair dealing, intentional/negligent misrepresentation, false and deceptive trade practices, malicious interference with contractual relationship, negligence/failure to warn, and breach of warranty of merchantability. Defendants have now filed with this Court a motion to dismiss plaintiffs’ Complaint pursuant to Mass.R.Civ.P. 12(b)(6). As grounds thereof, defendants argue that the claims alleged in the Complaint are precluded by the terms of the applicable Tariff and the Service Agreement.
For the following reasons, defendants’ motion to dismiss is DENIED as to Counts I, Hand IV and ALLOWED as to Counts III, V, VI and VII.
BACKGROUND
Customer Management Group (“CMG”) is engaged in the business of providing customized operating solutions for identifying and improving customer profitability to companies throughout the United States and Canada. In the course of its business, CMG relies on various modes of telecommunication and information resources.[1]
In the fall of 1998, CMG began researching[2] vendors for the installation and maintenance of various telecommunications services in conjunction with CMG’s relocation to its new offices located at 222 Berkeley Street, Boston, Massachusetts. While in communication with the various vendors, including AT&T Corporation (“AT&T”),[3] CMG informed AT&T that it required its main corporate telephone number[4] to have the capacity to handle several voice calls simultaneously. On September 30, 1998, AT&T forwarded a price quotation via facsimile to CMG. In its quotation, AT&T committed to providing data, facsimile and telephone services to CMG with no installation fee.
On October 2, 1998, CMG and AT&T executed a Service Agreement (the “Agreement”) under which AT&T agreed to install and service seven business lines for the corporate telephone number and one Internet line. The Agreement provides, in pertinent part, the following:
I. Payment and Installation . . . Provider [Defendants] will provide an estimated service date for services ordered. Provider will make reasonable efforts to install the Network Services by the estimated service date but shall have no liability to Customer in the event of delays . .[5]
II. Limitations on Liability. Except as provided for in Section 13 [which is the Credit for Service Interruption section], Provider shall have absolutely no liability of any kind whatsoever to Customer in connection with the Network Services or the Network or the other matters covered by this Agreement.
13. Credit for Service Interruption. [This section sets forth the applicable credits for service interruption.]
14. Miscellaneous. This Agreement and the attached Acceptable Use Policy constitute the entire agreement of the parties regarding the subject matter hereof . . . THERE ARE NO AGREEMENTS, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR USE WITH REGARD TO THE SERVICES OR THE NETWORK, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN.
On October 14, 1998, AT&T told CMG that the necessary equipment would be delivered and installed at CMG’s offices by the close of the business day on October 19, 1998. However, AT&T was unable to meet this installation date. In late October 1998, AT&T scheduled the installation of the network data lines for *284 November 2, 1998. On November 2, 1998, AT&T informed CMG that the equipment needed for the installation of the network data lines was not available and that the scheduled installation would not take place as planned.
On multiple occasions, CMG reported various problems with AT&T’s services. On November 3 and November 5, 1998, CMG reported to AT&T problems with its telecommunications service including line quality problems. On November 5, 1998, AT&T informed CMG that it had improperly installed the analog lines. Although AT&T promised to provide a remote solution, the remote solution failed to resolve the problem.[6]
On November 7, 1998, CMG reported to AT&T that its telephone system was not functioning. On November 9, 1998, AT&T informed CMG that its telephone service had not been activated yet, possibly as a result of a clerical error. On November 9, 1998, CMG reported to AT&T that its telephone system was again out of service. On November 10, 1998, CMG reported to AT&T that the corporate telephone number gave false signals to incoming callers.[7] On this same day, CMG reported to AT&T that it was having problems with the hunt group for its telecommunications services.
On November 11 and November 12, 1998, CMG reported to AT&T that its modem lines were not functioning properly. On November 12, 1998, CMG’s voice lines were restored. On November 12, 1998, CMG reported to AT&T that it had problems with its facsimile line.
Throughout mid- and late-November 1998, CMG attempted to obtain customer service from AT&T. However, AT&T informed CMG that it would not provide customer service to CMG until December 4, 1998.
On November 16, 1998, CMG reported to AT&T that the facsimile and modem lines were not functioning properly. On November 30, 1998, CMG called AT&T twice in an effort to report that CMG was unable to receive incoming telephone calls on its telecommunications system.
On December 9, 1998, CMG reported to AT&T that the telephone lines had not been functioning for fifteen minutes and that the Internet line had not been working for two days. The service was promptly restored.
From December 1998 through March 1999, CMG experienced similar interruptions in its telecommunications service. On fifteen separate occasions, CMG’s corporate telephone number, facsimile and data lines were inoperable for more than four hours at a time. On at least five occasions, the telecommunications system was inoperable for more than one full day; on numerous occasions the lines were of such poor quality that the telecommunications services, including, voice, facsimile, electronic mail, and Internet access, were unusable. Additionally, from October 1998 through March 1999, callers to the corporate telephone number were often disconnected or received misleading signals.[8]
As a result of the problems CMG experienced with the telecommunications system, CMG obtained cellular telephones in order to maintain communications with customers and to provide ongoing services for their customers. Also, employees of CMG began working from their homes in order to maintain voice and data access. In the meanwhile, CMG continued to pay rent, utilities and other expenses for its office space.
In March 1999, CMG switched to a new telecommunications company and gave notice to AT&T to that effect. Thereafter, on March 19, 1999, AT&T disconnected CMG’s services without providing CMG with notice. CMG was left with no service for several hours.
Plaintiffs are suing defendants for consequential damages, including lost profits, lost customers, loss of goodwill, lost income, lost productivity, lost business opportunity, payment of various services which it was unable to utilize, interest, costs and attorneys fees.
RULINGS OF LAW
When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must accept as true the allegations of the complaint, as well as any reasonable inferences to be drawn from them in the plaintiffs favor. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). The complaint must be accorded a “generous reading.” New England Insulation Co. v. General Dynamics Corp., 26 Mass.App.Ct. 28, 29 (1988). “The plaintiffs need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim." Bell v. Mazza, 394 Mass. 176, 184 (1985).
A “complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).
The Agreement the parties entered into states that “(a]ll other telecommunications services ordered hereunder are provided by an affiliate of Teleport Communications Group Inc., pursuant to, and subject to, the terms of applicable federal and/or state tariffs.” Therefore, both parties agree that the applicable state tariff is controlling in the case at bar.
The applicable tariff is Tariff TCB-1 (“Tariff’). In 1997, Teleport Communications Boston filed the Tariff with the Massachusetts Department of Telecommunications and Energy (“DTE”). The Tariff governs “(t]he furnishing of intrastate communications service to business (non-residential) customers only in connection with one-way and/or two-way information transmission between points within the Commonwealth of Massachusetts.” The Tariff states, in relevant part, the following:
*285 5.1.3. Liability of the Company
5.1.3.1. Because the customer has exclusive control of its communications over the services furnished by the Company, and because interruptions and errors incident to these services are unavoidable, the services the Company furnishes are subject to the terms, conditions, and limitations specified in this tariff . . .
5.1.3.2 The liability of the Company for damages arising out of the furnishing of these services, including but not limited to mistakes, omissions, interruptions, delays, or errors, or other defects, representations or use of these services arising out of the failure to furnish the service, whether caused by acts of commission or omission, shall be. limited to the extension of allowances for interruption as set forth in 5.6.[9] The extension of such allowances for interruption shall be the sole remedy of the customer. The Company will not be liable for any special, consequential, exemplary or punitive damages a customer may suffer, whether or not caused by the intentional acts or omission or negligence of the Company’s employees or agents.
5.1.3.9 THE COMPANY MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE . . . (capital letters and bold type in original).
In Massachusetts, a telecommunications company is bound by statute to file a tariff covering “public inspection schedules showing all rates, joint rates, fares, telephone rentals, tolls, classifications and charges for any service of every kind rendered or furnished ...” and is required to specify “all conditions and limitations” affecting the same. G.L.c. 159, §19 (1992 ed. & Supp. 1999). The Supreme Judicial Court has expressly held that filed tariffs “have the ‘force and effect of law.’ ” Disk ‘N Data, Inc. v. AT&T Communications, Inc., 415 Mass. 886, 888 (1993), citing Video Educ. Career Inst. v. American Tel. & Tel. Co., C.A. No. 88-1721-N (D.Mass. 1990).
A telecommunications company is expressly forbidden from discrimmating by “extend[ing] to any company or person any rule, regulation, privilege or facility except such as are specified in the said schedule and regularly and uniformly extended to all persons and corporations under like circumstances for the like, or substantially similar, service.” G.L.c. 159, §19.
A filed tariff, such as the one in the case at bar, protects a telephone company from liability for an interruption in a transmission, “even one that has resulted from its own negligence ...” Lebowitz Jewelers Ltd., Inc. v. New England Tel. & Tel. Co., 24 Mass.App.Ct. 268, 272 (1987), citing Wilkinson v. New England Tel. & Tel. Co., 327 Mass. 132, 236 (1951).
In Disk ‘N Data, the court affirmed a tariff[10] which “limitjed] liability for any claim or suit ‘for damages associated with the installation, provision, termination, maintenance, repair or restoration . . .’ ” of the service at issue. Disk ‘N Data, 415 Mass. at 888. Similarly, in Leibowitz Jewelers Ltd., the court held that the limitations of liability provisions of a state tariff[11] precluded a claim against the telecommunications service provider for negligent interruption of transmission. Leibowitz Jewelers Ltd., 24 Mass.App.Ct. at 272.
Accordingly, the Tariff to the case at bar serves to limit AT&T's liability to the extension of allowances for interruption of services. AT&T is not liable for any “special, consequential, exemplary or punitive damages . . . whether or not caused by the intentional acts or omissions or negligence of the Company’s employees or agents.”
I. Breach of Contract
Count One of plaintiffs’ Complaint alleges breach of contract. Plaintiffs seek damages for lost profits, loss of goodwill, lost income, lost productivity and reimbursement for various services which it was unable to utilize.
Under the terms of the Agreement, AT&T agreed to install seven operational business lines for the corporate telephone number and one Internet line for the corporate offices of CMG. CMG claims that AT&T breached the terms of the Agreement in fifteen specific ways[12] which relate to the deficiencies of the voice telecommunications services. Generally, plaintiffs breach of contract claim stems from installation delays, inadequate customer service, installation of an experimental system, technical repair problems, failing to fulfill warranty obligations, failing to satisfy reasonable commercial expectations, termination without notification, and service interruptions.
The terms and conditions governing the local telecommunications services at issue are set forth in the applicable tariff filed with the DTE. Accordingly, plaintiffs’ allegations, as they relate to the breach of contract claim, are governed by and are subject to the provisions of the Tariff. Therefore, CMG’s remedy, if any, are limited to the extension of credit allowances as provided for in the Tariff.
Pursuant to the Tariff, “(t]he liability of the Company for damages arising out of the furnishing of these services including . . . mistakes, omissions, interruptions, delays, or errors, or other defects . . . shall be limited to the extension of allowances for interruption . . . The extension of such allowance for interruption shall be the sole remedy of the customer . . .” Additionally, the Agreement specifically states that defendants “shall have absolutely no liability of any kind whatsoever . . . in connection with the Network Services or the Network or the other matters covered by this Agreement. . . ,” except interruption of service credits.
*286 Therefore, the Agreement and the Tariff limit CMG’s remedy for their breach of contract claim to a credit allowance for service interruption.[13] Plaintiffs’ contract claim will not be dismissed because plaintiffs have surmounted the minimal hurdle required to survive a motion to dismiss for failure to state a claim for which relief may be granted. Plaintiffs allege facts in the Complaint which may support a breach of contract claim. Specifically, plaintiffs discuss the service delays and interruption of service.
Plaintiffs argue that insofar as the Agreement references equipment, the Tariff is inapplicable because the Tariff only applies to the furnishing of “services,” and equipment is not a service. However, this distinction is illusory. By the very essence and nature of telecommunications, services necessarily entail the installation of equipment.
Accordingly, although Count One will not be dismissed, plaintiffs’ damages are limited to the extension of allowances for interruption credits.
II. Breach of Covenant of Good Faith and Fair Dealing
Count Two of plaintiffs’ Complaint alleges breach of covenant of good faith and fair dealing. For this claim, plaintiffs re-allege the same facts as in their breach of contract claim. Plaintiffs seek damages for lost profits, loss of goodwill, lost income, lost productivity and payment for various services.
“Every contract implies good faith and fair dealing between the parties to it.” Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). quoting Kerrigan v. Boston, 361 Mass. 24, 33 (1974). The implied covenant of good faith and fair dealing provides “that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-472 (1991) (citations omitted).
For the same reasons set forth in the breach of contract discussion above, the damages for this Count will be limited to interruption credits pursuant to the Tariff and Agreement. Defendants’ claim does not fail because a “generous reading” of the Complaint reveals that plaintiffs assert that AT&T’s conduct had the effect of destroying or injuring CMG’s rights to receive the fruits of the contract. See New England Insulation Co. v. General Dynamics, 26 Mass.App.Ct. 28, 29 (1988).
Accordingly, Count Two is not dismissed, however, damages are limited to the extension of allowances for interruption credits.
HI. Intentional/Negligent Misrepresentation
Count Three of plaintiffs’ Complaint alleges intentional/negligent misrepresentation. Plaintiffs allege that defendants fraudulently induced them to select its services and equipment by knowingly and negligently making misrepresentations of material fact and omissions regarding the services it would provide. Plaintiffs seek lost profits, loss of goodwill, lost income, lost productivity and the payment of various services.
Specifically, plaintiffs claim that defendants represented that it had an appropriate telecommunications system, that it would complete proper installation of the telecommunications system and network data lines by certain dates, that it failed to disclose the experimental nature of the service, that it would not provide customer service before December 4, 1998, that it failed to remedy technical and telephone problems, that it falsely represented that certain trouble tickets had been resolved and that it made false representations as to the installation date. On reliance on these misrepresentations, plaintiffs entered into an agreement with defendants.
Two types of misrepresentations are actionable in Massachusetts: intentional and negligent misrepresentation. Joseph R. Nolan & Laurie J. Sortorio, Tort Law §143 (1989). In an action for intentional misrepresentation, a plaintiff must prove “that the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon such representation as true and acted upon it to his damage.” Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152 (1963), quoting Kilroy v. Barron, 326 Mass. 464, 465 (1950).
Negligent misrepresentation are misrepresentations that occur without the speaker’s knowledge “that the statement is false if the truth is reasonably susceptible of actual knowledge or otherwise expressed, if through a modicum of diligence, accurate facts are available to the speaker.” Acushnet Federal Credit Union v. Roderick, 26 Mass.App.Ct. 604, 605 (1988) (citations omitted).
Justifiable reliance on a false statement of fact is a necessary element of a misrepresentation claim. Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999). CMG’s misrepresentation claim must fail because it cannot show that it reasonably relied on any alleged false statement of fact by defendants. CMG is presumed to have had knowledge of the terms of the Tariff and thus may not assert that it justifiably relied on any fact that varies or contradicts the terms of the Tariff. The Tariff specifically states that “[t]he Company makes no warranties or representations . . . except those expressly set forth herein.” Similarly, the merger clause of the Agreement disclaims all “representations . . .” See Katz v. MCI Telecommunications Corp., 14 F.Sup.2d 271, 274-75 (1998) (E.D. N.Y) (fraudulent misrepresentation claim barred by the filed-tariff doctrine).
Additionally, a promise of an installation date is not actionable as an inducement because the Agreement only states that “[provider will make reasonable efforts to install the Network Services by the estimated *287 service date but shall have no liability to Customer in the event of delays ...”
Plaintiffs argue that public policy demands that the Tariff not be applied to limit AT&T's liability. However, Massachusetts courts have consistently rejected public policy arguments relative to tariffs limiting liability. See Lebowitz Jewelers Ltd., 24 Mass.App.Ct. at 273; Wilkinson, 327 Mass. at 136.
Accordingly, Count Three is dismissed in its entirety.
IV.False and Deceptive Trade Practices
Count Four of plaintiffs’ Complaint alleges false and deceptive practices in violation of G.L.c. 93A, §§2, 9 and 11. Plaintiffs assert fourteen alleged misrepresentations of fact for their G.L.c. 93A claim. These allegations are almost identical to those set forth in the intentional/negligent misrepresentation claim.[14] Since these allegations are not actionable under an intentional/negligent misrepresentation claim, they do not support a G.L.c. 93A claim. Therefore, these claims cannot be used to support a 93A claim.
Additionally, plaintiffs point to twelve incidents which, in their opinion, amount to “unfair and deceptive acts.” These allegations are identical to the allegations asserted in their breach of contract claim.
Accordingly, Count Four, relative to the allegations regarding unfair and deceptive acts only, is not dismissed. However, plaintiffs’ damages, if any, are limited to the extension of interruption credits.
V.Malicious Interference with Contractual Relationship
Count Five of plaintiffs’ Complaint alleges malicious interference with contractual relationship. Plaintiffs contend that defendants are guilty of malicious interference with contractual relations because, in part, defendants intentionally and maliciously failed to provide proper equipment, proper customer service, proper technicians, and failed to correct technical errors. Therefore, according to plaintiffs, because of defendants’ wrongful conduct, CMG’s customers were unable to maintain consistent and reliable telecommunications with them. Plaintiffs seek damages for lost profits, lost customers, loss of goodwill, lost income, lost productivity, lost business opportunity and payment for various services which it was unable to utilize.
A claim for malicious interference with contractual relationship requires an allegation that defendants knowingly induced a third party to breach the contract. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272-73 (1991); see American Tel. & Tel. Co. v. IMR Capital Corp., 888 F.Sup. 221, 257 (D.Mass. 1995) (failure to allege how service problem induced customers to break off contracts results in dismissal of interference claim). Plaintiffs failed to allege any conduct by defendants amounting to a knowing inducement of third parties to breach contracts with plaintiffs. Also, there is nothing that can be gleaned from the Complaint inferring that defendants knowingly induced third parties to breach contracts with plaintiffs. Therefore, plaintiffs’ claim must fail.
Accordingly, Count Five is dismissed in its entirety.[15]
VI.Negligence/Failure to Warn
Count Six of plaintiffs’ Complaint alleges negligence/failure to warn. CMG claims that AT&T attempted to install a telecommunications system which was experimental and/or had only been used at a small number of other companies and that this information was never disclosed to them.[16] Plaintiffs claim that defendants had a duty to warn or instruct plaintiffs regarding the experimental nature of the telecommunications system and that the system was inferior. Plaintiffs seek damages for lost profits, lost customers, loss of goodwill, lost income, loss of productivity and payment for various services which it was unable to utilize.
This claim fails because damages are not available under a negligence theory for purely economic harm not involving injury to a person or property. Bay State-Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co., 404 Mass. 103, 107 (1989).
Accordingly, Count Six is dismissed in its entirety. [17]
VII.Breach of Warranty of Merchantability
Count Seven of plaintiffs’ Complaint alleges breach of warranty of merchantability. Plaintiffs claim that defendants warranted, expressly and impliedly, that the telecommunications system and its components were merchantable, safe, operational and fit for their intended purposes and/or for those purposes which are reasonably foreseeable. Plaintiffs seek damages for lost profits, lost customers, loss of goodwill, lost income, lost productivity, and payment for various services which it was unable to utilize.
Express and implied warranties of merchantability may be excluded in writing which is conspicuous and mentions the word “merchantability.” G.L.c. 106, §2-316 (1999 ed.). CMG’s claims for breach of warranty of merchantability are specifically precluded by the Tariff and the Agreement. The Tariff states that ”[t]he Company makes no warranties or representations, express or implied either fact or by operation law, statutory or otherwise, including warranties of merchantability and fitness for a particular use ...”
Similarly, the Agreement states that “[t]here are no agreements, warranties or representations, express or implied either in fact or by operation of law, statutory or otherwise, including warranties of merchantability and fitness for a particular purpose of use with regard to the services or the network, except those expressly set forth herein.”
*288 Therefore, since both the Tariff and the Agreement successfully disclaim all warranties this claim must be dismissed.
Accordingly, Count Seven is dismissed in its entirety.
ORDER
For the foregoing reasons, defendants’ motion to dismiss is hereby DENIED as to Counts I, II and IV and ALLOWED as to Counts III, V, VI and VII.

Including telephone, facsimile, the Internet, the World Wide Web, electronic mail and other voice and data systems.

This research consisted of gathering information regarding available services and capabilities, installation costs, monthly fees and other cost estimates from various telecommunications vendors including Frontier, Harvardnet, Bell Atlantic and AT&T Corporation.

In July 1998, AT&T merged with Teleport Communications Group, Inc. and TCG CERFnet, Inc.

CMG's corporate telephone number was (617) 262-8811. CMG began to use this corporate telephone number in September of 1997.

"Customer may terminate its order ... [if] not installed within 30 days of the estimated service date . . .”

In a letter dated November 5, 1998, Thomas Manning, the President of CMG, gave written notice to AT&T of his intention to seek damages as a result of the problems experienced by CMG.

These false signals consisted of busy signals, a message that the corporate telephone number was out of service and continuous ringing. CMG later learned that AT&T incorrectly installed the telephone lines so that only incoming calls could enter the system at one time.

For instance, callers would get repeated busy signals, a message that the corporate telephone number was no longer in service, and continuous ringing.

Section 5.6 of the Tariff sets forth the credit allowance for interruptions in service.

The tariff in Disk ‘N Data states that “[t]he Company’s liability, if any, for its willful misconduct is not limited by this tariff. With respect to any other claim or suit... for damages associated with the installation, provision, termination, maintenance, repair or restoration of WATS . . . the Company's liability, if any, shall not exceed an amount equal to the monthly recurring charge provided for under this tariff

The tariff in Lebowitz Jewelers Ltd. states
[t]he Telephone Company shall not be responsible ... for damages arising out of mistakes, omissions, interruptions, delays or errors or defects in transmission, except those caused by its failure to furnish facilities suitable for ordinary telephone service or its failure to maintain and operate such facilities in a manner proper for telephone service. The liability of the Telephone Company for damages caused by its failure to furnish facilities suitable for ordinary telephone service or its failure to maintain and operate such facilities in a manner proper for telephone service shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay or error or defect in transmission occurs.

CMG claims that AT&T breached the terms of the Agreement by (1) failing to select proper installation equipment, (2) failing, neglecting and/or refusing to install properly seven operational business lines and one Internet line, (3) failing to provide adequate customer service, (4) failing to provide technicians who could resolve the technical problems with the telecommunications system, (5) failing to address and correct unsatisfactory conditions with the telecommunications system, (6) failing to fulfill warranty obligations, (7) failing to inform regarding the experimental nature of the telecommunications system, (8) failing to satisfy reasonable commercial expectations, (9) failing to honor commitments to install a functional, operational system in a timely manner, (10) creating a telephone signal on the corporate telephone number which wrongfully informed callers that the number was no longer in service, (11) creating a telephone signal which wrongfully disconnected calls, (12) failing to install analog lines sufficient for accessing electronic mail and sending or receiving facsimile, (13) terminating the telecommunication service without notice, (14) closing out trouble tickets before the issue was resolved, and (15) attempting to install an inferior telecommunications system.

This Court refuses to dismiss plaintiffs’ claims solely because they have not specifically requested interruption credits as part of their damages.

The only new allegation is that defendants “terminatled] the telecommunication service without affording the plaintiff any notice thereof."

Plaintiffs assent to the dismissal of this claim without prejudice.

In November 1998, during a repair incident, Edward Murphy, one of TCG's most senior technicians, stated that CMG was the third company to receive this experimental service.

Plaintiffs assent to the dismissal of this claim without prejudice.